

**FILED**
OCT 11 2023
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | **SEALED** |
| v. | § § § | Case No. 4:23 cr 225 <br> Judge Mazzant |
| KYLE KELLY CARTER | § | |

### INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

### General Allegations

At all times material to the facts set forth in this Indictment:

#### *The Defendant and His Entities*

1.  Defendant **Kyle Kelly Carter, M.D.** was an individual residing in Keller, Texas. Carter was a licensed physician in the state of Texas.

2.  Care First Physicians, P.A. ("Care First"), was a business that was organized and operated in Carrollton, Texas. **Carter** was the Director, Secretary, Treasurer, and Registered Agent of Care First.

3.  Precision Family Medicine, P.A. ("Precision"), was a business that was organized and operated in Carrollton, Texas, in the Eastern District of Texas. **Carter** was the Partner, Principal, and Registered Agent of Precision.

#### *National Provider Identifier*

4.  A National Provider Identifier ("NPI") is a unique 10-digit numeric identifier for covered health care providers, created to help send health information electronically

safely and efficiently. Covered health care providers, all health plans, and health care clearinghouses must use NPIs in their administrative and financial transactions. A health care provider's NPI does not change, even if their name, address, taxonomy, or other information changes.

### *BCBSTX and BlueCard Member Claims Process*

5. Blue Cross Blue Shield ("BCBS") was an association of independent, locally operated Blue Cross and Blue Shield Companies. Blue Cross Blue Shield of Texas ("BCBSTX") was a statewide, customer-owned health insurer headquartered in Richardson, Texas, in the Eastern District of Texas.

6. BlueCard for Blue Cross Blue Shield ("BlueCard") was a program that linked participating health care providers and the independent BCBS plans across the country and around the world through a single electronic network. BlueCard enables members to obtain health care services while traveling or living in another Blue Cross and/or Blue Shield Plan's service area.

7. BCBS generally reimbursed claims for health care services rendered by a qualified "servicing provider," which included physicians, hospitals, and other specific healthcare professionals. However, according to its policies, BCBS did not cover services provided by athletic trainers or university athletic departments.

### *Vivature, Inc.*

8. Vivature, Inc. ("Vivature") was a company that purported to provide medical billing services to university health centers, athletic departments, counseling centers, and

high schools. Vivature invited these organizations to use Vivature to help generate revenue by billing students' private health insurance for services already provided on campus. Specifically, part of Vivature's billing services included insurance claims adjudication for physical therapy services provided to student-athletes. Per agreements with certain universities (hereinafter, "Institutions"), Vivature stated it would "recover potential third-party billing revenue for the Institution using tested, proven software, experienced billing personnel, effective quality assurance procedures, assertive collection techniques, and careful tracking of individual claims through the billing system." Also per these agreements, Vivature would receive a portion of the revenue generated by their insurance claims submissions.

9. When a student-athlete was injured on campus in relation to a university sport, the Institution's athletic trainer determined the appropriate diagnosis code and treatment plan for the injury. Vivature captured this information in its software, along with student demographics, insurance data, and other notes related to the injury for claims submission to the insurance company. Vivature then electronically submitted the claim to the insurance company for billing. Insurance companies then, after evaluating the submission, paid the claim directly to the Institution, who shared the revenue with Vivature per the parties' contract.

## COUNT ONE

Violation: 18 U.S.C. § 1349<br>(Conspiracy to Commit Wire Fraud)

10. The General Allegations section of this Indictment is realleged and incorporated by reference as though fully set forth herein.

11. From in or around April 2014 and continuing up through and including 2018, in the Eastern District of Texas and elsewhere, the defendant, **Kyle Kelly Carter**, along with others both known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree to violate 18 U.S.C. § 1343, wire fraud, that is to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent material pretenses, representations, and promises.

### Overview of the Conspiracy

12. **Carter** and others executed a multi-million dollar scheme to defraud commercial insurance companies by falsely claiming that a physician was rendering medical services for injured student-athletes. In reality, **Carter** did not see or treat these student-athletes. The services were actually performed by athletic trainers employed by the educational institutions' athletic departments, and who were specifically excluded from insurance companies' reimbursement policies. Vivature submitted these claims to the insurance companies, named **Carter** as the servicing provider, and used his NPI number

on the claim. In return for allowing the fraudulent use of his name and credentials, Vivature made regular payments to **Carter**. In total, **Carter** was fraudulently listed as the "servicing provider" on at least 4,000 fraudulent claims relating to at least 210 patients, and the intended loss to BCBS alone was over $1 million.

## Purpose of the Conspiracy

13.  It was the general purpose of the conspiracy for **Carter** and his co-conspirators to unlawfully and unjustly enrich themselves by obtaining health care reimbursements through materially false and fraudulent pretenses, representations, and promises.

## Manner and Means of the Conspiracy

14.  The manner and means by which **Carter** and his co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

   a.  The defendant agreed with representatives of Vivature to participate in the "services" Vivature offered to Institutions;

   b.  The defendant and his co-conspirators opened bank accounts and businesses under their names to receive, deposit, and transfer fraudulently obtained health care reimbursements;

   c.  The defendant and his co-conspirators submitted materially false and fraudulent claims to commercial health insurance providers, including BCBSTX, falsely stating that **Carter** was the servicing provider on treatments which were actually provided by athletic trainers.

   d.  The defendant was listed as the "servicing provider" for student-athletes, despite not actually seeing, meeting, or treating these individuals. Such submissions occurred simultaneous with Carter being listed as the "servicing provider" for patients of his private family practice clinic in Carrollton, Texas, in the Eastern District of Texas.

e. The defendant received payments from Vivature for his role in executing the scheme to defraud; and

f. The defendant and his co-conspirators caused transmissions that affected interstate commerce by causing the claims to be submitted to BCBSTX, which then communicated electronically with other BCBS health plans claims to facilitate the adjudication of said claims.

## Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy, **Carter** and his co-conspirators committed the following acts, among others, in the Eastern District of Texas and elsewhere.

### *Carter's Arrangement with Vivature*

15. On or about April 7, 2014, Carter's company, Care First entered a partnership with Vivature. On or about October 15, 2014, **Carter** entered into an agreement with Vivature to become a "Medical Director." In exchange for **Carter's** Medical Director services, Vivature agreed to pay **Carter** $2,500 per month.

16. **Carter** corresponded with Vivature representatives regarding the use of his NPI on multiple occasions. For instance, in a February 25, 2015 email from **Carter** to a representative of Vivature, **Carter** acknowledged receiving payments from Vivature and Vivature's use of his credentials: "I did receive the initial stipend check. Thank you for that. It did not say what month that was to cover. Can you clarify that? My assumption was the stipend would start whenever you were billing under my license. That would make it for October. If that is not the case please clarify."

…
…

*Examples of Carter as the "Servicing Provider" on Fraudulent Insurance Submissions*

17. On or about July 31, 2014, Vivature entered into an agreement with East Texas Baptist University ("ETBU") to provide web-based medical billing services, insurance verification, and credentialing services. According to the contract, Vivature agreed to pay ETBU 65% of the total insurance collections received for claims billed for ETBU student-athletes. ETBU is located in Marshall, Texas, in the Eastern District of Texas.

18. On or about December 9, 2014, Vivature entered into an agreement with LeTourneau University ("LETU") to provide web-based medical billing services, insurance verification, and credentialing services. According to the contract, Vivature agreed to pay ETBU 65% of the total insurance collections received for claims billed for LETU student-athletes. LETU is located in Longview, Texas, in the Eastern District of Texas.

19. On or about September 1, 2016, **Carter** was listed as the servicing provider of treatment rendered to a student-athlete at ETBU with the initials "K.R." That same day, on September 1, 2016, **Carter** was listed as the servicing provider for treatment rendered to two student-athletes at LETU with the initials "D.K." and "E.P." All these student-athletes' claims were submitted and paid through a Bluecard BCBS plan.

20. Despite purporting to render treatment services for student-athletes at two different universities on September 1, 2016, **Carter** was also listed as the servicing provider of treatment rendered to approximately twelve different patients at his private practice, Precision Family Medicine, P.A. ("Precision"), in Carrollton, Texas, in the Eastern District of Texas. Precision is located approximately one hundred and fifty miles west of LETU and ETBU.

21. In March 2021, law enforcement interviewed an LETU employee with initials "P.P.", who confirmed that **Carter** was designated by Vivature to be LETU's supervising physician. Although **Carter** was allegedly LETU's supervising physician, P.P stated that PP. did not see **Carter** on LETU's campus, assess LETU student-athletes, or provide any treatment to LETU student-athletes. P.P understood that Vivature had paid LETU approximately $100,000 over the past five years.

22. According to claims data provided by BCBSTX, from approximately February 12, 2015, through October 2, 2018, **Carter**, NPI XXXXXX2797, was the servicing provider for the following volume of claims which were received, and ultimately paid, by BCBS health care plans for the following universities in the Eastern District of Texas:

| Institution | No. of Patients (approximate) | No. of Claims (approximate) | Total Billed (approximate) | Total Paid (approximate) |
|---|---|---|---|---|
| LETU | 137 | 3,544 | $938,586 | $67,848.48 |
| ETBU | 63 | 532 | $130,460 | $11,251.05 |
| Lamar University | 15 | 85 | $23,234 | $5,859.65 |
| **Total** | **215** | **4,161** | **$1,092,280** | **$84,959.18** |

23.  During the course of the scheme, Vivature paid **Carter** at least $54,000. Vivature's billing scheme involved other physicians and extended to universities around the country. In sum, Vivature fraudulently claimed at least $90 million from insurance companies and received at least $8 million in paid claims.

All in violation of 18 U.S.C. § 1349.

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461

1. The allegations contained in Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant has an interest.

2. Upon conviction of any violation of 18 U.S.C. § 1349, the defendant, **Kyle Carter**, shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to the offense(s), pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The property, which is subject to forfeiture, includes but is not limited to, a money judgment, and all interest and proceeds traceable thereto, representing the proceeds of the offenses, for which the defendants are jointly and severally personally liable.

4. Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendant:

   a. Cannot be located upon the exercise of due diligence;
   b. Has been transferred, or sold to, or deposited with a third party;
   c. Has been placed beyond the jurisdiction of the Court;
   d. Has been substantially diminished in value; or

  e. Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of the defendants up to the value of the above-described forfeitable properties, including, but not limited to, any identifiable property in the names of the defendants, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

5. By virtue of the commission of the offenses alleged in this Indictment, any and all interest that the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c) and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C. § 982(b)(1).

A TRUE BILL

_____
GRAND JURY FOREPERSON

DAMIEN DIGGS
UNITED STATES ATTORNEY

_____     10/11/2023
ANAND VARADARAJAN       Date
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | **SEALED** |
| v. | § § | Case No. 4:23 cr 225 |
| KYLE KELLY CARTER | § § | Judge Mazzant |

### NOTICE OF PENALTY

### COUNT ONE

Violation: 18 U.S.C. §§ 1349 (Conspiracy to Commit Wire Fraud)

Penalty: Not more than 20 years imprisonment, a fine not to exceed $250,000, or both; supervised release of not more than 3 years..

Special Assessment: $100.00