IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. 4:23-CR-225 |
| | § | |
| | § | |
| KYLE CARTER | § | |

## MOTION TO EXCLUDE CASE AGENT JASON RENNIE AND REQUEST FOR HEARING

TO THE HONORABLE AMOS L. MAZZANT:

Defendant Kyle Carter respectfully moves to exclude Special Agent Jason Rennie as a witness, whether summary, fact, or expert,[1] in this trial and from the prosecution team in this case. As a member of the investigation and trial team for years, SA Rennie has been irreparably tainted by virtue of also being a member of the government's filter review team for over three months. As such, SA Rennie was permitted access to voluminous materials that were intentionally segregated by the government from the trial team—which SA Rennie is a key member of[2]—as presumptively privileged materials from the government's search of Vivature, Inc.'s offices. On July 30, 2024, the lead prosecutor for the filter team in this case advised Dr. Carter's counsel that SA Jason Rennie had access to the filter team's materials from April 22 until his removal on July 25, 2024.

These presumptively privileged materials made accessible to SA Rennie during his months on the filter team have irreparably tainted him as a fact or other witness in Dr. Carter's trial. He

---

[1] The defense does not believe that SA Rennie qualifies as an expert. The government also takes this position in ECF No. 68.
[2] SA Rennie was the lead agent on the Vivature search and swore out two probable cause affidavits for Vivature search warrants.

must be excluded from the trial team as a result of this irreparable and presumptive taint to ensure that Dr. Carter is given a fair trial and to protect his Due Process rights.

## I.      INTRODUCTION

The exposure to privileged information is sufficient to exclude a witness from testifying. The taint from access to privileged information—in this case, intentional and over a period of months—infects his entire perception and knowledge of the facts that will be tried. In turn, that infection permeates throughout the entire investigation and ultimately spreads to the jury if that witness testifies or even participates on the trial team while carrying that infection. Ultimately, this results in the jury's fact-finding process being irreparably damaged, and therefore unreliable, and the denial of the basic right to a fair trial.

Here, SA Rennie has been an investigating (and lead) agent on this and the related *Bass* investigation and indictment for years. Despite that, Assistant U.S. Attorney Russell James recently confirmed to the defense and government trial teams that SA Rennie:

1. Had uninterrupted access to the Vivature filter team's segregated materials beginning on or about April 22, 2024 and continuing until AUSA James affirmatively terminated his access on July 25, 2024;

2. On at least one occasion, logged into and accessed the filter team's segregated materials; and

3. Provided training to both of the filter team's agents on the use of search terms provided by Vivature and defense counsel with the filter team's materials.

The government has not disputed any of this.

Summarized, SA Rennie was afforded months-long access to a database of presumptively privileged materials from the government's search of the company at the center of the indictment

against Dr. Carter and, on at least one occasion, used that access to facilitate the filter team's search of those materials. He is the lead case agent on this case. He is a fact witness; the government's presumptive summary witness; and has been proffered as a quasi-expert witness. *See* ECF No. 68. SA Rennie has been a critical part of the investigative team for years—he took part in the search of Vivature's business premises; swore out a second probable cause search warrant affidavit; reviewed case documents; interviewed dozens of potential witnesses; and helped develop the government's overall pretrial strategy against Dr. Carter. There is more than sufficient evidence that SA Rennie is tainted and must be walled off from the trial team's further pretrial activities and participation in any way at trial.

## II. SUMMARY OF ARGUMENT

On July 30, 2024, after litigating filter team protocol issues for over a month, the government revealed that SA Rennie had access to the two million .pst files residing with the filter team for more than three months. SA Rennie also ***trained*** the filter agents in how to use the review database ***utilizing the potentially privileged*** documents collected from the search.[3] A filter protocol is only effective if the prosecution team abides by it. Here, SA Rennie did not.

SA Rennie's access to segregated privileged materials was not limited to the potentially privileged electronic documents. He also reviewed privileged materials from physical items seized at Vivature. Counsel for Vivature and counsel for Bass both sent letters to the filter AUSA and trial team, warning that privileged work product and attorney-client materials were contained in the physically seized documents. *See* Exhibit 1, Vivature Letter and Exhibit 2, Bass Letter. Further, upon information and belief, Vivature sent a second letter to the filter team on July 30, 2024. In

---

[3] It is assumed that "training" required him to review some documents in the potentially privileged dataset. Additionally, common sense dictates that one does not train on obviously non-privileged documents, but instead on documents that are either privileged or close calls.

this correspondence, counsel provided specific examples of the information that Vivature asserted was privileged and/or protected by the attorney work-product doctrine which were not subject to a thorough privilege review before being provided to the prosecution team. Given the government's complete disregard for Vivature's privilege, Dr. Carter respectfully requests that the Court disqualify Agent Rennie from proffering any testimony in this case or serving as a member of the prosecution team.[4]

### III.  BACKGROUND

On October 11, 2023, the grand jury indicted Dr. Carter on one count of conspiracy to commit wire fraud. The indictment is based on allegedly fraudulent insurance submissions relating to private healthcare providers and athletic trainers, with a charged time period of approximately April 2014–2018. ECF No. 1, ¶¶ 11, 15–23. His alleged kickbacks are around $50,000. *Id.* ¶ 23. On January 23, 2024, Dr. Carter made his initial appearance. ECF No. 7.

The government alleges that this conduct was a small part of a broader, nationwide scheme orchestrated by Vivature in the course of providing medical billing services to various universities across the country. On January 10, 2024, the government separately charged other defendants affiliated with Vivature for their roles in the alleged scheme. *United States v. Mouzon Bass III, et al.*, Case No. 4:24-CR-007-SDJ ("*Bass*").

#### A.  The Vivature Search

On January 19, 2024, Judge Averitte of the Northern District of Texas issued a search and seizure warrant authorizing the search of Vivature's offices. Exhibit 3, Order Granting Search. On or about January 22, 2024, the government executed a search warrant at Vivature, located at 15305

---

[4] Dr. Carter is operating on information provided from the filter AUSA or that is not privileged. When conferring on this motion, the prosecution team advised that it had additional information regarding SA Rennie's access to privileged information, but advised that it viewed this issue as resulting in litigation, so decided not to share it at that time. There is sufficient information to disqualify SA Rennie immediately. However, to the extent the factual record needs to be further developed, Dr. Carter requests an evidentiary hearing.

Dallas Parkway, Suite 800, Addison, Texas (the "Vivature Search"). Exhibit 4, Evidence Log. The government seized physical and digital evidence, including binders, invoices, notebooks, folders, training manuals, loose notes, various business records, and emails. The government also collected a hard drive with roughly 2 million emails that it specifically selected (".pst files") and segregated from the investigative team as potentially privileged and for later review. *Id*. These were given to the filter team as segregated potentially privileged materials.

On June 7, 2024, Judge Durrett held a hearing at which the parties discussed approximately two million emails that were collected during the Vivature Search. On June 28, 2024, designated filter AUSA Russell James sent an email to counsel for Dr. Carter and counsel for defendants in the *Bass* case, providing them with the search and filter protocol and logistics related to the government's production of potentially protected information from the Vivature search. AUSA Russell advised counsel that the search and filter protocol "will govern the management of the data generally described above [seized digital devices and .pst and email sets] and more specifically described within the protocol and attachments." Exhibit 5, James Email re Filter Protocol. The protocols put in place were meant to allow defense counsel access to the two million emails before the prosecution team to raise any issues to the filter team before any protected information was improperly disclosed to the prosecution/investigation team.

B.      **The Filter Protocol**

On February 11, 2024, prosecution team AUSA Varadarajan and filter team AUSA James circulated a memorandum to filter team agents, Special Agents Haley Armentrout and Jerrod McCormick, and all members of the prosecution and filter team providing the filter protocol for the Vivature investigation. Exhibit 6, February Filter Team Protocol.[5] The protocol was put in

---

[5] Nearly three pages of the initial filter protocol is redacted. The government posited that the redactions are due to work-product concerns. However, there must be separation between a filter team and a prosecution team such that

place to "protect the Targets' attorney-client and work-product privileges as well as the Targets' Constitutional rights. These instructions are further designed to prevent the disclosure of privileged and/or otherwise Constitutionally protected attorney-client information to case agents, investigators, and prosecutors assigned to the investigation, and to ensure that we effectively document our efforts to do so." *See id*.

Pursuant to the filter protocol, the government assigned two agents and an AUSA to the filter team "to review potentially protected material produced as a result of the email search warrant." It provided:

> Filter Team members will not be involved with the primary prosecution team's investigation, in any way, and may not have any further role in the investigation or prosecution of this case, unless some further privilege issue arises requiring additional review. The members of the filter team are prohibited from discussing with any investigator or prosecutor assigned to this case, or any other person not assigned to the filter team, any protected information they learn as a result of their assignment to this filter team.

*Id.* at 4.

The filter memorandum designated filter agents, SA Armentrout and McCormick, as the filter team agents to analyze information seized and to filter presumptively privileged materials. Further, AUSA James was designated as the filter team's legal member to analyze materials identified by the filter agents to determine whether documents contained potentially protected information. *Id.* at 5–6. The memorandum specifically tasked filter AUSA James with ensuring that the presumptively privileged items or information had been removed, had not been reviewed by the prosecution team, and were returned to counsel for the privilege holder. *Id.* at 6. The memorandum also described the protocols for the reviewing, logging, and handling of seized material. *Id.* at 7–11.

---

their communications are not in anticipation or in furtherance of litigation strategy. The Court should conduct an *in camera* inspection of the redacted portions of the February filter protocol (Exhibit 6).

It further provided that if an investigative team agent or prosecutor found any document or item "that appears to contain protected or potentially protected information, they [were to] not examine it further and immediately notify" the filter agents and filter AUSA who will conduct a review of the material. It permitted the filter agents and AUSA to consult with investigative agents or prosecutors as necessary, but made clear that *"no member of the filter team should disclose the substance of any presumptively or potentially protected item to any investigative agent* or prosecutor unless the item is finally determined not to be protected, consistent with these instructions, and may otherwise be disclosed to the investigative agents or prosecutor." *Id.* at 15 (emphasis added).

On June 6, 2024, the government issued a supplemental filter memorandum providing that "[i]n addition to the filter terms originally set out in the Memo dated February 11, 2024, the terms shown in the attached email from SA Jason Rennie, and search terms provided by counsel for Vivature . . . have been added into the filter review process." Exhibit 7, 06/06/24 Filter Protocol.

C. **Agent Rennie's Authorized Access to the Filtered Materials**

On July 30, 2024, filter AUSA James disclosed that two investigative team case agents, including Agent Rennie, were granted months-long access to the filter team's search materials. He advised the government and defense counsel that SAs Rennie and Chris Ranney had authorized access to these materials from April 22, 2024 until July 25, 2024. Additionally, AUSA James advised that SA Rennie logged into and accessed the filter team's materials on at least one occasion, training the filter agents on searching the filter team's materials. This appears to be confirmed by the supplemental filter memorandum, to which the government attached an email from Agent Rennie in which he recaps a meeting with the filter team agents and provides search term protocols. Exhibit 7 at 2–3.

Additionally, the hard-copy documents seized during the Vivature Search were not subject to a privilege review at all—even though a review of the documents seized clearly indicates that potentially privileged material was contained in the documents. Upon information and belief, counsel for Vivature specifically detailed the privileged items for AUSA James. The prosecution team has been asked, but will not confirm, whether it ceased accessing the physically seized materials, despite a clear invocation of privilege by counsel for Vivature and Bass. However, the defense understands that SA Rennie (1) used the physically seized items to secure a June 3, 2024 search warrant and (2) used the physically seized items in potential witness interviews.

### D. The Government Designates Agent Rennie as a Fact and Expert Witness

On July 31, 2024, the government filed an Expert Witness Notice designating SA Rennie as an expert witness. *See* ECF No. 68. It suggests that the topics on which Rennie would testify may be covered under Rule 701 of the Federal Rules of Evidence pertaining to opinion testimony offered by lay witnesses. *Id.* at 1. The government further indicates that it intends to call SA Rennie to testify as its investigative and summary witness:

> [He will be called to testify] regarding his investigation into the criminal conduct at issue. His testimony will be based on his knowledge of the case and his experience as a white-collar criminal investigator. The government anticipates that Agent Rennie will testify about the course of the investigation, types of evidence uncovered during the investigation, and the nature of the fraud scheme employed by the Carter and his co-conspirators. The government also expects that Agent Rennie will identify particular evidence that was significant in the FBI's investigation, such as emails, financial transactions, and healthcare claims data, and what role each of these played in the fraud scheme. In addition, Agent Rennie will discuss specific instances and events during the alleged conspiracy where the claims made by Carter and his co-conspirators were demonstrably false, such as Carter's representation that he was providing medical services to student athletes when in reality, he was not on campus.

*Id.* at 3.

## IV. ARGUMENT

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The Fifth Circuit recognized that the benefits of the privilege "accrue only if the clients remain 'free from the consequences of or apprehension'" of involuntary disclosure of those confidential communications. *In re Itron, Inc.*, 883 F.3d 553, 561 (5th Cir. 2018) (quoting *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888)). The government, like anyone else, is precluded from intruding into attorney-client privileged material. When the government unconstitutionally invades attorney-client communications, the court should design a remedy that neutralizes the taint of the invasion in order to ensure a fair trial and protect a defendant's Due Process rights.

In a criminal case in particular, the need for that remedy is fundamental and particularly acute: a defendant's Sixth Amendment rights are violated when the government's intrusion results in prejudice to the defendant. *United States v. Marshank*, 777 F. Supp. 1507, 1525 (N.D. Cal. 1991). It is well founded that courts should "identify and then neutralize the taint by tailoring suitable relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." *United States v. Morrison*, 449 U.S. 361, 366 (1981). Suppression of evidence or testimony is a proper remedy when the government intrudes into the attorney-client relationship. *United States v. Kilrain*, 566 F.2d 979, 982 (5th Cir. 1978); *see also United States v. Sander*, 615 F.2d 215, 219 (5th Cir. 1980).

Attorney work product must similarly be protected. As recognized by the Supreme Court in *Hickman v. Taylor*,

> it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference.

329 U.S. 495, 510 (1947). While perhaps more "frequently asserted as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital." *United States v. Nobles*, 422 U.S. 225, 236 (1975). Both the "the attorney-client privilege and the work-product doctrine jointly support the Sixth Amendment's guarantee of effective assistance of counsel." *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 174 (4th Cir. 2019).

### A. Agents Rennie's and Ranney's Months-Long Access to Privileged Materials Taints Him and Requires His Removal.

SA Rennie, as a member of the prosecution team and a designated witness, impermissibly intruded into the attorney-client relationship between Vivature and its attorneys and was provided inappropriate access to materials segregated by the government as presumptively privileged. This invasion is particularly egregious because this information resided with the filter team, so there was no question that there were concerns that the emails were in fact potentially privileged. The government affirmatively segregated them from the trial team (including SA Rennie) for that exact reason.

It is undisputed that SA Rennie had access to the filter team's segregated materials from Vivature from April 22 to July 25, 2024. Agent Rennie has, on at least one occasion, but perhaps more frequently, accessed the filter team's materials. Further, Agent Rennie trained other filter agents using the filter team's potentially privileged materials. It is impossible to know what information Agent Rennie has learned and how that may taint his testimony. This is not an instance where a privileged document can easily be suppressed from admission at trial; Agent Rennie cannot be permitted to offer even limited testimony in this case, nor assist the prosecution team at trial or in any further investigation. His entire perspective on this case has been tainted by

inappropriate access to documents he had no right to access. The Court cannot risk the Due Process violation of Dr. Carter's rights that would flow from SA Rennie's participation in this trial.

SA Rennie's access to (1) the materials segregated for review by the filter team and (2) physical documents seized during the Vivature Search constitute a violation of the filter protocol put in place by the government to avoid just such access. The memorandum setting forth the filter protocol provides, "Investigative agents have obtained, by search warrant, electronic data and physical documents associated with the Targets. ***Before investigative agents review the emails within the accounts, they will be reviewed by the filter team who will be responsible for making the initial determination as to whether any of the seized items contain protected information.***" Exhibit 6 at 6 (emphasis added). It further requires that "no member of the filter team should disclose the substance of any presumptively or potentially protected item to any investigative agent or prosecutor unless the item is finally determined not to be protected…" *Id.* at 15. When the filter team allowed SA Rennie to access protected information prior to review by the filter team (indeed, he and SA Ranney were made *part of the filter team*), the government violated the express terms of the filter protocol and Dr. Carter's Due Process rights. The fact that the he trained members of the filter team using emails collected from the Vivature search demonstrated a "callous disregard" of the "process in place to protect [Vivature's and Dr. Carter's] privileged information." *Harbor Healthcare Sys., L.P. v. United States*, 5 4th 593, 599 (5th Cir. 2021).[6]

---

[6] Numerous courts have addressed issues that can arise when the government uses filter teams. The Sixth Circuit in *In re Grand Jury Subpoenas* explained that "taint teams present inevitable, and reasonably foreseeable, risks to privilege, for they have been implicated in the past in leaks of confidential information to prosecutors." 454 F.3d 511, 523 (6th Cir. 2006). It also pointed out an "obvious flaw in the taint team procedure: the government's fox is left in charge of the [defendants'] henhouse, and may err by neglect or malice, as well as by honest difference of opinion." *Id.* The Fourth Circuit in *In re Search Warrant Issued June 13, 2019* also expressed worry about "the possibility that a filter team—even if composed entirely of trained lawyers—will make errors in privilege determinations and in transmitting seized materials to an investigation or prosecution team. 942 F.3d 159, 177 (4th Cir. 2019). Here, these concerns have been realized to the detriment of Vivature and Dr. Carter.

Here, Agent Rennie's impermissible intrusion into the attorney-client relationship impermissibly taints his knowledge and disqualifies him as a witness or trial participant. It is impossible for the Court to sort out how any particular piece of privileged information consciously or subconsciously affects a witness's knowledge. *See United States v. Danielson*, 325 F.3d 1054, 1071 (9th Cir. 2003). Courts have suppressed evidence when government filter teams fail to protect privileged information. *See Harbor Healthcare*, 5 4th at 600 (ordering return of privileged property because charges were not yet brought, but the government acknowledged that suppression is an adequate remedy to "prevent the government from using certain materials in a judicial proceeding"). For example, in *United States v. Sullivan*, the government confirmed that, like here, defendant's strategy documents were inadvertently passed to the prosecution team. Cr. No. 17-00104 JMS-KJM, 2020 WL 1815220 at *6 (D. Haw. Apr. 9, 2020). While the court in *Sullivan* declined to dismiss the indictment, the court suppressed all evidence improperly obtained in violation of the filter protocol due to the "reckless and grossly negligent conduct demonstrated by the taint team." *Id.* at *10. Critically, the court found the suppression the appropriate remedy despite the fact that no member of the prosecution team viewed the suppressed materials. *Id.* at *9.

SA Rennie's exclusion is wholly appropriate where he had access to segregated materials that resided with the filter team. Likewise, in *United States v. Elbaz*, the government uploaded potentially privileged documents to a document database, some of which were reviewed by a member of the prosecution team. 396 F. Supp. 3d 583, 593 (D. Md. 2019). The court also declined to dismiss the indictment, but ordered that the emails be excluded from the trial. *Id.* at 596. Additionally, the court indicated that disqualification of the prosecutor who reviewed the privileged emails may be an appropriate remedy, but it did not have occasion to reach this issue because the prosecutor at issue was no longer a member of the prosecution team and the

government voluntarily decided to replace members of the trial team with new attorneys. *Id.* Here, the government exhibited a callous disregard for Vivature's and Dr. Carter's rights by making SA Rennie part of the filter review team and giving him months of authorized access to its segregated materials. The Court should order that he consequently be excluded as a witness and trial participant in Dr. Carter's trial. Any other outcome would violate Dr. Carter's rights to a fair trial and constitutional Due Process.

## V.   CONCLUSION

Based on the foregoing reasons, Defendant Kyle Carter respectfully requests that the Court disqualify Case Agent Rennie from further participation in the trial team's pretrial activities and that he be excluded from testifying as a witness and otherwise participating in this trial.

Dated: August 5, 2024                                                                 Respectfully submitted,

*/s/ Jeff Ansley*
Jeffrey J. Ansley
State Bar No. 00790235
jansley@vedderprice.com
Arianna G. Goodman
State Bar No. 24109938
agoodman@vedderprice.com
Samuel M. Deau
State Bar No. 24135506
sdeau@vedderprice.com
300 Crescent Court, Suite 400
Dallas, Texas 75201
469.895.4790

## CERTIFICATE OF CONFERENCE

On August 1, 2024, I conferred with Assistant U.S. Attorney Adrian Garcia. AUSA Garcia advised that the government is opposed to this motion.

*/s/ Jeff Ansley*
Jeffrey J. Ansley

## CERTIFICATE OF SERVICE

I certify that on this date, a true and correct copy of the foregoing document was forwarded to all known counsel of record in this cause *via* the Court's CM/ECF system.

*/s/ Jeff Ansley*
Jeffrey J. Ansley